UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

PRABIR DHAR,                               :
                                           :
                        Plaintiff,         :
                                           :          MEMORANDUM & ORDER
           -against-                       :
                                           :          10-cv-5681 (ENV) (VVP)
NYC DEPARTMENT OF                          :
TRANSPORTATION, JYOTISH SHAH, and          :          **FILED**
BOJIDAR YANEV,                             :          IN CLERK'S OFFICE
                                           :          U.S. DISTRICT COURT E.D.N.Y.
                        Defendants.        :          ★  SEP 2 4 2014  ★
-------------------------------------------------------------x
                                                      BROOKLYN OFFICE
VITALIANO, D.J.,

           *Pro se* plaintiff Prabir Dhar brings this action against his employer, the New

York City Department of Transportation ("DOT"),[1] and two of his supervisors,

Boris Yanev and Jyotish Shah for alleged violations of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981, 42 U.S.C. §

1983, 42 U.S.C. § 1985, the New York State Human Rights Law ("NYSHRL"), the

New York City Human Rights Law ("NYCHRL"), and the Equal Pay Act of 1963,

29 U.S.C. § 206(d) ("EPA"). Dhar, according to his complaint, claims that

defendants discriminated against him on the basis of his race, religion, and national

---

[1] DOT is not a suable entity. *See Am. Petroleum & Transp., Inc. v. City of New York*,
902 F. Supp. 2d 466, 467 (S.D.N.Y. 2012) *aff'd*, 737 F.3d 185 (2d Cir. 2013) ("the
City's departments are not separate suable entities."); New York City Charter § 396
("All actions and proceedings for the recovery of penalties for the violation of any law
shall be brought in the name of the city of New York and not in that of any agency,
except where otherwise provided by law."). For the reasons discussed below,
however, Dhar's claims would be dismissed even if he had properly brought them
against the City of New York rather than DOT. In any event, the action against DOT
is dismissed, but the City of New York is ordered substituted as defendant in its stead.

1

origin, subjected him to a hostile work environment, and retaliated against him for exercising his First Amendment rights. Dhar and defendants have each moved for summary judgment. For the reasons that follow, defendants' motion for summary judgment is granted and Dhar's cross-motion for summary judgment is denied.

## Background

The following facts are drawn from the complaint and the parties' submissions on their cross-motions, including their statements of material fact filed pursuant to Local Civil Rule 56.1. Any factual disputes are noted.

Dhar was hired by DOT on or about October 19, 1997, as an Assistant Civil Engineer (or "ACE") in the Bridge Inspection Unit ("BIU") of the DOT's Division of Bridges. (Defendants' Local Civ. R. 56.1 Statement of Undisputed Facts ("Def. 56.1 Stmt") ¶ 2.) He was interviewed for the position by, among others, Shah, the Director of the BIU and Dhar's direct supervisor. (*Id.*) Yanev is the Executive Director of the BIU, and Shah's direct supervisor. (Yanev Decl. ¶ 1.)

Dhar, who identifies as Bangladeshi and Christian, alleges that, during his tenure in the BIU, his supervisors have discriminated against him on national origin and religious grounds by denying him salary increases, promotions, necessary services, and opportunities for overtime pay; singling him out for undesirable and unreasonable tasks; and subjecting him to racial slurs. By contrast, Dhar claims that Shah and Yanev repeatedly gave employees of their own backgrounds preferential treatment. Specifically, Shah, who Dhar asserts is from the Gujarat province of India and is Hindu, is alleged to have favored other Indian/Gujurat, Hindu employees; Yanev, who Dhar asserts is from Bulgaria, has allegedly favored

2

other Eastern European employees. Dhar further asserts that Shah and Yanev have retaliated against him for complaining about this discriminatory treatment.

Dhar contends first, that he has been denied salary increases, while other more junior, less qualified, and less experienced ACEs—of the same national origin and/or religion as either Shah or Yanev—who were performing similar job assignments were recommended for increases by Shah and Yanev. (Compl. ¶¶ 18-19, 41.) Dhar highlights five colleagues in particular, all ACEs in the BIU: Kamlesh Patel, Jitendra Patel, and Mitul Patel, all of whom Dhar describes as being of Indian national origin, specifically from the Gujarat province, and of Hindu religion; Alexandr Bezdezhsky, whose national origin Dhar alleges is Ukrainian; and Radu Georgescu, whose national origin Dhar alleges is Romanian. (*See* Compl. Ex. B.)

Dhar further alleges that he has been denied opportunities for paid overtime, while other ACEs in the BIU have been given such opportunities, especially employees of Indian descent and Hindu religion. (Compl. ¶ 48; Pl. 56.1 Stmt. ¶ 107.) He zeroes in on Mitul Patel, who earned $50,000 in overtime in 2009 alone, well in excess of DOT's normally allowed limit of 20 percent of the employee's base salary. (Pl. 56.1 Stmt. ¶¶ 4, 106.) Dhar also alleges that Patel and other ACEs earned at least some of their overtime pay not from actual overtime work, but because Shah improperly changed their time sheets to reflect overtime work they did not perform. (*See* Pl. 56.1 Stmt ¶ 89-90, 144; Pl. Ex. "TSFO.") Defendants counter that the availability of overtime work within the BIU depends on the needs of the unit, and it is distributed by team leaders on a volunteer basis. (*See* Def. 5.1 Stmt ¶¶ 89-95.) Dhar's supervisor from 2003 to about August 2009, Jerry Kao, had requested not to

work overtime; as a result, his team was typically not offered overtime work, and had to request it from other team leaders if desired. (*Id.* at ¶¶ 91-92.) Defendants further present evidence that DOT employees are permitted to exceed the 20% limit with permission, and that, in 2009, Mitul Patel was asked—and approved—based in part on his computer science background, to take on a project that required copious overtime. (*Id.* at ¶ 107.)

Plaintiff's next grievance concerns the room he worked in. On or about September 24, 2009, as a result of a reorganization, Dhar was transferred to a different team within the BIU. Shah instructed him to move from Room 101, where he had been seated for six years, to Room 103—on the same floor of the same building—where his new team leader sat. (Def. 56.1 Stmt ¶¶ 48-49.) Dhar requested not to move rooms, setting off a months-long dispute with Shah and Yanev. (*See* Def.'s 56.1 Stmt ¶¶ 51-57.) Dhar apparently resisted the move in part because he felt unsafe working alongside another employee sitting in Room 103, Alexandr Bezdezhsky. (*See* Khandakar Aff., Ex. R at DD005.) Among other things, Dhar alleges that Bezdezhsky instigated an altercation with him in 2002 or 2003 in which the police were called. (Pl. 56.1 Stmt ¶ 49.) While no evidence of this incident is presented, the record confirms that, at times, Bezdezhsky acted belligerently with other employees, (*see, e.g.*, Pl. Ex. R (1/12/10 Testimony of Thirugnanam Mohan before DOT Advocate's Office) at 17, 21 (testimony that Bezdezhsky was "hostile" toward his supervisor and raised his voice with him, and that other team leaders did not want him)), and that, in November 2009, after Dhar entered Room 103 to speak with their shared team leader, Bezdezhsky yelled at Dhar, unprovoked, to get out.

(*See id.* at 6.) Additionally, Dhar refused to move because the new room lacked a computer and network access for him, which he needed to do his work, facts which defendants do not dispute. (*See* Pl. Ex. Q (March 9, 2010 Testimony of Jyotish Shah before DOT Advocate's Office) at 31.)

On December 1, 2009, Shah issued a Record of Progressive Discipline based on Dhar's failure to relocate his workplace as instructed. (Khandakar Aff., Ex. S.) Dhar moved to Room 103 later that month. In his new location, however, plaintiff complains that he lacked a proper place to sit, an internet connection, a telephone connection, and other essential services that all other employees had, and that his requests for phone and internet service were ignored. (Compl. ¶ 32, 33.) Dhar eventually received a computer and internet service, but they were provided about a month after he moved. In the interim, he shuttled back to his old desk to use a computer. A direct phone line was provided after about three to six months. Before that, Dhar had to share a phone line with another employee. (Khandakar Aff., Ex. Q at 166-67; Pl. 56.1 Stmt. ¶ 58.) Dhar's root allegation is that he was singled out to transfer rooms, with its accompanying denial of necessary services, as a result of the claimed discrimination. In support, he submits evidence that other ACEs were permitted to remain in different rooms with the apparent acquiescence of their team leaders. (Pl. 56.1 Stmt. ¶ 47.) Dhar further alleges that Yanev threatened and verbally abused him for refusing to transfer rooms. He appears to base this on an email that Yanev sent to Dhar threatening that, if he refused to move, his working hours would not be authorized and his time would be reduced—particularly the time he was using to write unnecessary emails surrounding his room transfer. (*See*

5

Khandakar Aff., Ex. R at DD005.)

In November 2009, Dhar filed a formal complaint with the DOT Advocate's Office, based on the alleged pay discrepancies and room transfer, among other things. That office initiated a formal investigation in December 2009, including taking testimony from witnesses. The case was eventually closed with a finding that Dhar's claims were not substantiated. (Compl. ¶ 26; Khandakar Aff., Ex. X.) Dhar also filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on or about November 14, 2009.

Thirugnanam Mohan, another of Dhar's supervisors, testified, on January 12, 2010, in connection with the Advocate's Office investigation. On or about January 25, 2010, Mohan complained to the Advocate's Office concerning certain behavior by Shah following his testimony. He said that Shah had questioned him regarding why he had been talking to the Advocate's Office for so long and inquired about the subjects of discussion. Following his testimony, Mohan claims Shah retaliated against him by attempting to change his assignments. He says Shah also instructed him to start treating Dhar in a "harsher manner." (*See* Pl.'s Ex. "TMAO" at 1 (Office of the Advocate Investigative Action Sheet, dated Jan. 25, 2010.)) Although he expressed feeling "weakened" by Shah's actions, Mohan stated that he would not obey the instruction to treat Dhar differently, and that he would document Shah's behavior toward him, and would continue to notify the Advocate's Office about any problems. (*Id.*) Mohan declined to file a formal complaint regarding these events.

Dhar alleges that the harassment not only continued, but accelerated

6

following his complaints. On April 29, 2010, a training class was conducted by a Staten Island Rapid Transit employee and was attended by a number of BIU employees, including Dhar, Shah, and Yanev. (Def. 56.1 Stmt ¶¶ 82-83; Compl. ¶ 45.) During the class, Dhar asked questions relating to proper safety procedures and about procedures for carrying a ladder during an inspection. Not surprisingly, the exact nature of his questions is unclear from the record. (Def. 56.1 Stmt ¶ 84; Khandakar Aff. Ex. CC.) Apparently some back-and-forth with the instructor ensued and, after the dialogue got heated, the instructor threatened to eject Dhar from the class. (Khandakar Aff. Ex. CC.) Shah ordered Dhar to stop speaking or he would throw him out of the class; Shah eventually did instruct him to leave the class. (*Id.*; Compl. ¶ 22.)

In January 2011, following an absence for illness, Dhar presented his supervisors with a doctor's note advising that he should be placed on light duty, performing no bending or lifting. (*See* Khandakar Aff. Ex. GG.) Dhar alleges that Shah disregarded the note and forced him to work in the field on January 25, 2011. (Pl. 56.1 Stmt ¶ 121.) Defendants vigorously dispute this claim. It is undisputed, however, that Dhar was not asked to go into the field for about a week after he presented the doctor's note. Mohan, the one who asked Dhar to perform the post-note field inspection, said, in an affidavit, that he believed that Dhar was able to return to field work at the time, and would not have asked him to do so otherwise. (Def. 56.1 Stmt ¶¶ 127-29.) It is not apparent from the doctor's note itself how long Dhar was supposed to have been on light duty. Dhar sheds no light on this, although it is undisputed that, at some point, he became able to perform all of his

job functions once again. (*See* Khandakar Aff., Ex. Q at 31.) In any event, and significantly, Dhar does not allege that he told anyone he was unable to perform the January 25, 2011 inspection for medical reasons, although he claims that in a meeting Shah and Mohan told him he would be subject to disciplinary action if he failed to conduct it. (Pl. 56.1 Stmt ¶ 127.) Nor does Dhar allege, in the first place, that the inspection involved any bending or lifting, nor that he suffered any health consequences from doing the inspection. Rather, Dhar seems primarily concerned with the self-perceived unfairness of his experience compared to Kamlesh Patel's a decade earlier. In that incident, Kamlesh Patel was placed on "light duty" in 2002 as a result of a medical condition, and then remained in his new non-inspection role permanently, even after he was able to return to full duty, apparently based on personnel needs. (Def. 56.1 Stmt. ¶¶ 121-24.) Dhar contends that Patel's condition was never adequately substantiated by medical documentation as required, but, rather, only by a vague, unverified doctor's note that, at best, indicated that Patel should be on light duty for ten months. The real reason Patel was permanently excused from inspections, Dhar alleges in conclusory fashion, was that he was favored by Shah. (*See* Pl. 56.1 Stmt ¶¶ 105, 121.)

In October 2011, Shah failed to approve a timesheet of Dhar's, and, as a result, Dhar was issued his October 14, 2011 paycheck on October 17, 2011 in a paper check rather than in the form of the usual direct deposit. Dhar was told he could pick the check up at a DOT building in Manhattan. Dhar's work unit was located in Brooklyn. Apparently for parking-related reasons, Dhar asked Shah to pick it up for him. (Def. 56.1 Stmt. ¶ 141.) Shah did so and personally delivered the

8

check to Dhar on November 10, 2011. Dhar claims that Shah intentionally failed to approve the time sheet in order to deprive him of income. Defendants parry that it was an inadvertent mistake. Further, defendants note that Shah was out of the office from October 13 to October 21, and, thus, was unable to remedy the error sooner. (Shah Decl. at ¶ 32.)

From his diary of discriminatory acts for this time period, Dhar alleges, among others, that Shah threatened to cut his time and salary; ordered him to carry a large, heavy ladder at an inspection site, which was outside of the normal duties for an assistant civil engineer;[2] and that defendants failed to give him annual performance evaluations, as required by his employment contract. (*See* Compl. ¶¶ 41, 43, 46, 48.) Dhar further charges that, on March 6, 2012, he was forced to conduct a bridge inspection under unsafe conditions, including inadequate blocking of traffic, and that this was a conspiracy by his supervisor and coworkers to cause an accident that could have killed or injured him. (*See* Pl. 56.1 Stmt. ¶¶ 131-37.) The inspection was completed without injury or incident.

Additionally, Dhar alleges that Shah yelled slurs at him, particularly calling him a "stupid Bangladeshi Christian" and "idiot Bangladeshi Christian" on at least two occasions. (*See* Pl. Ex. "DISO.") The context and time period in which these comments took place is unclear from the record; in his deposition, Dhar testified that they occurred in either 2006 or 2007, or possibly as early as 2002, and

---

[2] Dhar apparently refused to carry the ladder, and although Shah threatened him with disciplinary action for his refusal, no action was taken. (*See* Khandakar Aff. Ex. AA, Ex. Q at 53; Shah Decl. ¶ 14.)

elsewhere in his moving papers he asserts that the comments were made at points in 2010 and 2011. Dhar submits a signed but unsworn affidavit from a colleague, who states that he witnessed Shah and Yanev calling Dhar these names in the lunch room on two occasions, once near the end of 2010, and once in December 2011. (*See* Statement of Dushawn Davis, dated Nov. 21, 2012 at ¶¶ 5-6.)[3] Dhar alleges that, as a result of the hostile working environment created by Shah and Yanev, he has suffered post-traumatic stress disorder, depression, and a sleep disorder. (Compl. ¶¶ 33, 55.)

EEOC issued Dhar a Right to Sue Letter on September 13, 2010. Dhar filed the instant complaint on December 8, 2010.

### Standard of Review

A district court must grant summary judgment if "there is no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the merits of a summary judgment motion, the motion court is not to try issues of fact, but, rather, to "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and

---

[3]    Though the Court notes the unsworn statement, it is not in admissible form and will not be substantively considered on this matter.

the court will resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Gummo v. Vill. of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. *See* Fed. R. Civ. P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Instead, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23. If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

Finally, because Dhar is *pro se*, the Court will read his pleadings and papers "liberally . . . and interpret them to raise the strongest argument that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

Discussion

I.    **Title VII Claims**

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Dhar brings several claims pursuant to Title VII, based on pay discrimination, failure to promote, retaliation, hostile work environment, and other acts or occasions of mistreatment. Each claim is separately analyzed below.

    A.    **Title VII Claims Against Individual Defendants**

As an initial matter, defendants correctly argue that "individuals are not subject to liability under Title VII." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000)). Consequently, Dhar's Title VII claims are dismissed as to Shah and Yanev.

    B.    **Title VII Discrimination Claim Against the City of New York**

The Supreme Court has established a three-part framework for analyzing a Title VII discrimination claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must make a *prima facie* showing that discrimination has occurred. *Id.* at 802. The burden of production then shifts to the defendant employer to give a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 802-03. Finally, the plaintiff must show by competent evidence that the reasons given by the defendant are merely a pretext for discrimination. *Id.* at

804; *see also Patterson*, 375 F.3d at 221. Summary judgment must be granted with caution in Title VII actions, particularly "where intent is genuinely in issue." *Chambers,* 43 F.3d 29, 40 (2d Cir. 1994) (citations omitted). Nonetheless, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate." *Butts v. New York City Dep't Of Hous. Pres. And Dev.,* 00-CV-6307, 2007 WL 259937, at *8 (S.D.N.Y. Jan. 29, 2007), *aff'd* 307 F. App'x 596 (2d Cir. 2009).

### 1. Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of discrimination, Dhar must show that (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *Demoret v. Zegarelli,* 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas,* 411 U.S. at 802). Although "the burden of establishing a prima facie case is not onerous, and has been frequently described as minimal," *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir. 1997), the Second Circuit has also noted that a "jury cannot infer discrimination from thin air," *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir. 1998). Ultimately, a Title VII plaintiff must show more than the mere suffering of an adverse employment consequence by a member of a protected class.

13

It is undisputed that Dhar meets the first two elements. As to the third, an adverse employment action is "a 'materially adverse change' in the terms and conditions of employment," that is, a change which is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (tangible employment action is one which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").

The adverse employment actions that Dhar can be understood to allege in his filings include: (1) receiving less pay than other ACEs in the BIU; (2) being denied opportunities for overtime compensation; (3) being forced to move to another room on the same floor; (4) being forced to conduct an inspection on January 25, 2011 in contravention of a doctor's note; (5) the delay in receiving his October 2011 paycheck; (6) being told to carry a ladder on at least one occasion at a field inspection; (7) being told to leave a training class; (8) being forced to conduct an inspection on March 6, 2012 in unsafe working conditions and other inspections in

14

inclement weather; and (9) being reprimanded verbally and by email and threatened with disciplinary action.[4] Of these, only (1) and (2) arguably constitute adverse employment actions for purposes of making out a *prima facie* case of Title VII discrimination. The others all describe conditions that, while perhaps unpleasant, did not materially affect the terms or conditions of Dhar's employment.[5]

---

[4] Dhar also alleges that he was denied promotions, a claim addressed separately below.

[5] Dhar's change from Room 101 to Room 103 did not result in any change in his duties or responsibilities. The lack of phone and computer service in Room 103 was resolved within a few months, and in the interim the only impact on Dhar was that he had to share a phone with a colleague and use a computer down the hall—quintessential "mere inconveniences." *See, e.g., Nonnenmann v. City of New York*, 174 F. Supp. 2d 121, 132-33 (S.D.N.Y. 2001) *overruled on other grounds by Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121 (2d Cir. 2005) (Denial of a transfer request was not an adverse employment action where plaintiff "made no allegation that the salaries, benefits, or opportunities for advancement in the two jobs are any different," even though the new job would have been closer to plaintiff's home.). And, while it does appear from the record that Bezdezhsky may have been an unpleasant and insubordinate employee at times, there is no evidence to suggest that he posed a threat to Dhar or anyone else. Nor does being asked to carry a ladder at an inspection on one occasion constitute an adverse employment action, particularly in light of testimony by at least two witnesses that carrying a ladder was an acceptable task for someone in Dhar's position. (*See* Pl. Ex. "JKO" (3/28/12 Dep. of Jerry Kao) at 85; "BYO" (4/26/12 Dep. of Bojidar Yanev) at 128-29.)) As to Dhar's doctor's note, Dhar fails to even allege, let alone provide evidence of, how long he was supposed to be on light duty, what tasks, if any, he undertook in the January 25, 2011 inspection in violation of his doctor's recommendation, or that he told anyone that doing the inspection would violate his doctor's orders. Dhar's vague and conclusory allegations cannot reasonably support a finding of an adverse employment action. As for the March 6, 2012 inspection, Dhar has presented no evidence from which an inference can be drawn that the inspection took place in unsafe conditions; even it did, Dhar's participation—along with other employees of varying races, national origins, and religions—would not be an adverse employment action. Additionally, it has long been held in this circuit that a mere delay in are receiving a paycheck is not an adverse employment action. *See, e.g., Sprott v. Franco*, 94-CV-3818, 1997 WL 79813, at n.5 (S.D.N.Y. Feb. 25, 1997). Nor, finally, are "reprimands, threats of

Dhar's allegations that he was paid a lower salary than other ACEs and was denied opportunities to earn overtime pay, having met preliminary scrutiny, must next be evaluated as to whether they occurred under circumstances giving rise to an inference of discrimination, in satisfaction of the fourth element of his *McDonnell-Douglass prima facie* case.

Dhar falls short with respect to his overtime claim. Although he demonstrates that other ACEs earned more overtime pay than he did, plaintiff does not cite to any particular instance in which he sought an overtime opportunity, nor an instance where he was denied an ordinary course overtime opportunity, much less assert that an opportunity he sought from his employer was instead given to another employee who was not a member of plaintiff's class. Given the record evidence of how overtime work was distributed within the BIU, the fact that Dhar earned less than others is insufficient on its own to raise an inference of discrimination. *See Hubbard v. Port Auth. of New York & New Jersey*, 05-CV-4396, 2008 WL 464694, at \*12 (S.D.N.Y. Feb. 20, 2008) ("Although Plaintiffs generally allege that [their superiors] distributed choice overtime to non-minority co-workers, without affirmative and specific supporting evidence that Plaintiffs were actually denied overtime, this claim cannot survive summary judgment.") (quoting *Wilson v. NY. City Dep't of Transp.*, No. 01-CV-7398, 2005 WL 2385866, at \*18 (S.D.N.Y. Sept.

---

disciplinary action [or] excessive scrutiny . . . in the absence of other negative results such as a decrease in pay or being placed on probation." *See Honey v. Cnty. of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002) (citing cases).

28, 2005)). Dhar's alternative claim that Shah forged certain other ACEs' timesheets, in order to allow them to earn overtime compensation for work they never performed, (*see, e.g.*, Pl. 56.1 Stmt ¶ 92), is supported solely by Dhar's conclusory allegations, which are insufficient to create a disputed issue of fact.[6] And, obviously, the conduct plaintiff describes, if true, is a violation of New York law. The failure to extend a similar wrongful courtesy to a complaining employee cannot serve as a basis for entitlement to Title VII relief.

As to his salary claim, Dhar presents evidence that four of the five ACEs that he selects as comparator employees—who are of different national origin and/or religion than plaintiff—receive and/or were hired at higher salaries than he was.[7] These employees had the exact same job title, performed the same functions, and reported to the same superiors as Dhar. He also asserts that at least one, Jitendra Patel, had only a bachelor's degree, while it is undisputed that Dhar had a master's

---

[6]  Plaintiff does submit a series of time sheets merely demonstrating that Shah did, on certain occasions, make changes to some employees' clock-in and clock-out times. (*See* Pl. Ex. "TFO.") Dhar makes no showing that these corrections were improper, or show, to the extent that alterations were properly made, that Shah refused to make similar, proper, alterations for him, much less show that such refusal was motivated by discriminatory animus. Moreover, even if Dhar had made out a *prima facie* case of discrimination in the distribution of overtime, defendants have supplied an adequate non-discriminatory reason for the amounts of overtime that the various ACEs in the BIU earned during the relevant period, (*See* Def. 56.1 Stmt ¶¶ 89-111), and Dhar fails to demonstrate that this explanation is pretext.

[7]  Dhar cannot state a discrimination claim based on Kamlesh Patel's salary, because Patel has at all relevant times earned a lower salary than Dhar. (*See* Frankowski Decl. ¶¶ 11-14.)

degree in engineering. Drawing all inferences in plaintiff's favor, this evidence is sufficient to meet his *de minimus* burden to establish an inference of discrimination as to the salary differentials within the BIU, and, thus, Dhar makes out a *prima facie* case as to this claim. *See Butts*, 00-CV-6307, 2007 WL 259937, at *9 (showing that similarly-situated employees not in plaintiff's protected class were treated differently as to an adverse employment action raises an inference of discrimination).[8]

### 2. Defendant's Nondiscriminatory Reasons

The finding that a *McDonnell Douglass prima facie* case has been stated does not end the inquiry. It simply shifts the burden of production to defendants to come forth with a legitimate, nondiscriminatory reason for the differences in the relevant employees' salaries. To this end, defendants produce an affidavit from Jean Frankowski, DOT's Director of Personnel, Payroll and Timekeeping, a copy of the collective bargaining agreement between the City and Dhar's union, DC37 ( the "CBA"), and various official payroll records, among other evidence. (*See*

---

[8] Defendants argue that Dhar fails to satisfy the fourth element of his *prima facie* case because the comparator employees he selects are not "similarly situated" to him in "all material respects." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). In particular, defendants argue that the comparator employees were hired at different times, had different levels of experience at the time of hire, and were earning different amounts than Dhar prior to their employment with DOT. What constitutes "all material respects" varies from case to case, but must be judged based at least in part on "whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards," *id* at 40, which is clearly true for Dhar and the other ACEs in his department. Defendants' arguments are better viewed in the context of their non-discriminatory reasons for the pay differences, assessed below.

Khandakar Decl. Ex. C, H-J; Decl. of Jean Frankowski dated Nov. 13, 2012

("Frankowski Decl.")) Defendants argue that this evidence demonstrates that any

differences between Dhar's salary and those of his comparators are appropriate

under the CBA and in light of each employee's background and qualifications.

Pursuant to the CBA, ACEs are paid salaries at either the hiring rate, an

"incumbent rate"—which is a rate for individuals with at least two years of

experience with the City of New York—or a range between the incumbent rate and

the maximum rate for the job title. (*See* Frankowski Decl. ¶ 6.) Within that range,

differences in salaries are based on a number of factors, such as the employee's

prior experience in the relevant title and with the City, prior salary, and budgetary

constraints. (*Id.* at ¶ 7.) Employees receive incremental raises pursuant to

successive CBAs between the city and DC37. Discretionary raises are permitted

only in circumstances in which an employee has taken on additional tasks and

responsibilities in his position. (*Id.* at ¶ 16.)

Plaintiff's salary upon hiring was approximately $37,426. (*Id.* at ¶ 7.) This

was the then-effective incumbent rate, for which Dhar qualified based on the fact

that he had previously been employed as an Industrial Hygienist with the New York

City Department of Housing Preservation and Development. (*Id.* at ¶ 8.) Since his

hiring, Dhar has received incremental raises pursuant to subsequent CBAs, and as

of October 21, 2011, Dhar's salary was $58,192. (*Id.* at ¶ 6).

Jitendra Patel started as an ACE in the BIU on or about June 13, 2004, at a

starting salary of $49,440. (Frankowski Decl. ¶ 21.) At that time, the minimum

salary for an ACE was $42,368, the incumbent rate was $45,401, and the maximum rate was $52,000. (*Id.*) Prior to his appointment with DOT, Jitendra Patel had been earning approximately $52,000. According to Frankowski, he had prior experience as a civil engineer—although she fails to explain where, for how long, or in what capacity—and his starting salary was determined based in part upon his prior salary and civil engineering experience.[9] (*Id.* at ¶ 23.) Patel has never received a discretionary raise. (*Id.* at ¶ 25.) As of October 21, 2011, his salary was $60,268.

Mitul Patel commenced as an ACE in the BIU on or about April 10, 2006, at a salary of approximately $56,000. The minimum salary for an ACE was then $41,944, the incumbent rate was $48,239, and the maximum rate was $62,937. (*Id.* at ¶ 29.) Prior to joining DOT, he was working for Haider Engineering, earning approximately $63,635 annually. (*Id.* at ¶ 30.) Frankowski asserts that his prior salary and experience as a civil engineer were factors in determining his salary, although there is no evidence provided as to what his position or duties with Haider Engineering were. As of October 21, 2011, Mitul Patel's salary was $60,268.

Radu Georgescu started as an ACE in the BIU on or about December 24, 2007, at a starting salary of approximately $66,764, the then-maximum hiring rate for an ACE. (Frankowski Decl. ¶ 35, 37.) Prior to his appointment with DOT, Georgescu worked for HNTB Corporation with the title "Engineer II," earning

---

[9] The documentation defendants provide shows that Jitendra Patel's prior employment was as a construction project manager for repairs to NYCHA developments, but not whether this work entailed civil engineering.

approximately $73,715. (*Id.* at ¶ 38.) A contemporaneous memo in support

Georgescu's hiring refers to his "vast engineering experience over 20 years."

(Khandakar Decl. Ex. P.) Georgescu's salary was determined in part based on his

prior salary and his experience as a civil engineer. (Frankowski Decl. ¶ 39.) He has

never received a discretionary raise. As of January 27, 2012, Georgescu's salary

was $72,212.

Alexandr Bezdezhsky started as an ACE in the BIU on or about June 30,

2002, at a salary of approximately $41,134—the minimum salary for an ACE at that

time. (*Id.* at ¶ 15.) The incumbent rate was then $44,079 and the maximum rate

was $57,513. On March 16, 2008, Bezdezhsky received an 8% discretionary salary

increase, from $54,387 to $58,738, upon the recommendation of Yanev, Shah, and a

third supervisor, Sam Teaw. (*Id.* at ¶ 17; Def. 56.1 Stmt ¶ 17.) According to a

personnel form issued at the time, they recommended the increase because

organizational and personnel changes within the BIU had caused Bezdezhsky to

take on a series of additional responsibilities and duties, such as inspection of

pedestrian bridges and responding to hotlines, in addition to performing the

standard ACE duties. (Khandakar Ex. J.) As of October 21, 2011, Bezdezhsky's

salary was $61,088.

All of these employees were hired at salaries within the range set by the CBA,

with the exception of Bezdezhsky, who was hired at the minimum possible salary.

Of them, only Bezdezhsky ever received a discretionary raise, a decision that is

amply supported by contemporaneous documentation enumerating the additional

responsibilities he had taken on to justify the raise.  Although additional evidence as to Jitendra Patel and Mitul Patel's prior civil engineering experience would be helpful, defendants have nonetheless sufficiently articulated legitimate, non-discriminatory reasons justifying each employee's salary, given the employees' prior salaries, and the fact that each salary fell within or below the range set by the CBA. *See Humphries v. City Univ. of New York*, 13-CV-2641, 2013 WL 6196561, at *7 (S.D.N.Y. Nov. 26, 2013) (finding it significant that the plaintiff's salary fell within the posted range for her position).

### 3. Burden of Demonstrating Pretext

To show that defendants' proffered explanation is merely a pretext, plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for [the differences in pay] is false and as to whether it is more likely that a discriminatory reason motivated the employer'" to pay him less than his coworkers. *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 1001 (E.D.N.Y. 1999) (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir. 1998)).  Dhar fails to contradict the evidence of his comparators' prior salaries or the assertion that they had prior civil engineering experience.  Instead, he baldly asserts that the supporting documentation submitted by defendants has been falsified.  (*See* Pl. 56.1 Stmt. ¶ 5.) Dhar also represents that he had 20 years of experience at the time he was hired that DOT failed to take into account in setting his salary.  However, he nowhere claims that this experience was in engineering. Notably, the record, in fact, shows that his

prior position, also with the City, was as an industrial hygienist.

Dhar does correctly point out that Bezdezhsky, in his deposition, was unable to confirm that he ever performed the tasks and responsibilities that were memorialized in his employee records at the time to justify his discretionary raise, and even appeared to be unfamiliar with them. (*See* Dep. of Alexandr Bezdezhsky, 4/2/2012, at 30-35.) It is also clear from the deposition transcript, however, that Bezdezhsky had difficulty understanding Dhar's questions on this subject, a situation which was undoubtedly exacerbated by the fact that Bezdezhsky testified by way of an interpreter. (*See, e.g., id.* at 32 (when asked whether he used in-house bridge inspection software, Bezdezhsky stated that he did not understand the term "software.")) Moreover, even if Dhar was able to demonstrate that the reasons given to justify Bezdezhsky's discretionary raise were false, this would not be sufficient to survive summary judgment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") Dhar has presented absolutely no evidence from which an inference can be drawn that Bezdezhsky was given a discretionary raise as a result of discrimination. The only supposed evidence Dhar marshals in this regard is the fact that Bezdezhsky is Ukrainian and Yanev is Bulgarian which, needless to say, is insufficient.

At bottom, for all these reasons, there is no genuine issue of material fact on this point. Dhar fails to demonstrate that defendants' proffered nondiscriminatory

23

reasons for the disparities in pay between Dhar and his colleagues are a mere pretext for discrimination. Accordingly, his pay discrimination claim is dismissed.[10]

C.    Failure to Promote Claim

Dhar also alleges that defendants discriminated against him by denying him a promotion for which he was qualified. A failure to promote claim is evaluated under a variant of the *McDonnell-Douglass* burden shifting analysis, which requires a plaintiff to make a *prima facie* showing that (1) he is a member of a protected class; (2) he applied and was qualified for a job for which his employer was seeking applicants; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having his qualifications. *Butts*, 00-CV-6307, 2007 WL 259937, at *10 (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004)).

Plaintiff claims that he was denied promotion to either the Associate Project Manager or Construction Project Manager position, notwithstanding that he took and passed the Civil Service exams for and was placed on the Civil Service eligible list for these titles. Shah represents that no one in the BIU holds either of these titles, and that the unit has no need for them. (Shah Decl. ¶ 21.) This is consistent with what Shah told Dhar when he requested promotion in January 2012. (*See*

---

[10]    For the same reasons that Plaintiff's Title VII discrimination claim is dismissed, his § 1981 and § 1983 discrimination claims must also fail. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (Title VII claims and claims for race and national origin discrimination under Sections 1981 and 1983 are analyzed under the burden-shifting framework set forth in *McDonnell Douglass*). As such, those claims are dismissed as well.

Khandakar Decl., Ex. DD.)  Indeed, in addition to Dhar, Georgescu and Mitul Patel also passed the relevant Civil Service exams and were also placed on the eligible list for the two positions Dhar sought, but neither was promoted.  (Shah Decl. ¶ 22.)  Dhar, importantly, does not contest this account.  He does not allege, fatally, that there was ever any specific opening for either position that he sought, nor that he ever submitted an application.  Plaintiff instead points to three DOT employees, not of his protected class, who he claims were promoted from ACE to Associate Project Manager.  (*See* Pl. 56.1 Stmt. ¶ 114.)  Yet, the record shows that these individuals were not working in the BIU either at the time they received their promotions or after they were promoted, but rather were employed elsewhere within DOT.  (Khandakar Ex. DD (Dep. of Prabir Dhar) at 70-74.)  Additionally, there is no evidence in the record as to those employees' qualifications, nor the circumstances surrounding their promotions.  Dhar, in sum, fails to establish a *prima facie* case, because his employer did not have the title he targeted available and never sought applicants for it, and because he never applied for a specific position.  *See Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004) ("[T]he second element of a *prima facie* case cannot be established merely with evidence that a plaintiff generally requested promotion consideration.  A specific application is required.").  Having no substance, his failure to promote claim is dismissed.

### D.   Hostile Work Environment

On a different tack, plaintiff additionally claims that he was subject to a hostile work environment in violation of Title VII.  This claim is based on the two

incidents in which Shah and Yanev allegedly called him a "stupid Bangladeshi Christian," as well as on many of the same incidents described above in connection with Dhar's employment discrimination claim.

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 538 (S.D.N.Y. 2001) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). To state a claim for a hostile work environment, a plaintiff must show that the complained of conduct "(1) 'is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive;' (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive;' and (3) 'creates such an environment because of the plaintiff's [protected class].'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)). A court must assess whether a workplace should be viewed as hostile in light of the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Meckenberg v. New York City Off-Track Betting*, 42 F. Supp. 2d 359, 374 (S.D.N.Y. 1999) (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998)).

"[I]solated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in

26

concert or with a regularity that can be termed pervasive." *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1306 n. 5 (2d Cir. 1995). *See also Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, . . . there must be a steady barrage of opprobrious racial comments."); *Taylor v. Potter*, 99-CV-4941, 2004 WL 1811423, at * 15 (S.D.N.Y. Aug. 16, 2004) *aff'd*, 148 F. App'x 33 (2d Cir. 2005) (one-time use of a racial epithet in not evidence of a hostile work environment). Here, even accepting Dhar's version of the name-calling he endured, these two incidents alone, over 13 years, fail to rise to the level of severity or pervasiveness necessary for a successful hostile environment claim. Nor do the other allegations Dhar makes in this regard, such as having to conduct bridge inspections in the rain, suffice, even when viewed together. Indeed, as discussed above, most, if not all of Dhar's instances of alleged harassment amount to relatively mild employment grievances, the ordinary slings and arrows of the workplace. *See supra* n.5. This claim, too, is dismissed.

     E.    Retaliation

Shah and Yanev, Dhar contends, retaliated against him after he filed complaints with EEOC and with the DOT Advocate's Office in November 2009. In particular, Dhar alleges that Shah and Yanev assigned him to work in the field on rainy days without the correct protective attire, and deprived him of overtime. (*See* Compl. ¶ 22, 26.) Given Dhar's *pro se* status, the Court will also consider all conduct that Dhar alleges took place after November 2009 in weighing his retaliation claim.

Title VII prohibits retaliation against an employee who complains of a Title VII violation. *See* 42 U.S.C. § 2000e-3(a). Retaliation claims are evaluated under the same burden-shifting approach as Title VII antidiscrimination claims. To establish a *prima facie* case of retaliation, Dhar must show: "(1) participation in a protected activity; (2) that the defendant[s] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted).

Dhar engaged in protected activity when he filed his complaints, satisfying the first element of his *prima facie* case, and the record is clear that he satisfies the second as well. To fulfill the third, an adverse employment action, plaintiff must show conduct that "a reasonable employee" would have found to be "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 68 (2006). While they share a label, this is broader than the "adverse employment action" element of a substantive antidiscrimination claim under Title VII, in that it "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id. at* 64; *Hicks,* 593 F.3d at 165 ("Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader. . . ."). Nonetheless, "petty slights or minor annoyances that often take place at work and that all employees experience" do not constitute actionable retaliation. *White,* 548

28

U.S. at 68; *see also id.* (Title VII "does not set forth 'a general civility code for the American workplace.'"). The challenged conduct must be material, as judged by an objective standard, not a subjective one. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006).

The conduct that Dhar sets forth in support of his retaliation claim fails to meet even this less stringent standard. It is true that even minor acts of retaliation can amount to an adverse employment action when aggregated and viewed in context. *See Hicks*, 593 F.3d at 165. In *Hicks*, for example, the Second Circuit held that the defendant's changes to one plaintiff's work schedule and another's work location amounted to adverse employment actions, because the changes resulted in work environments that were objectively hazardous and dangerous. *Id.* at 169-70. By contrast, the acts of which Dhar complains are mere "petty slights" and "minor annoyances;" taken together, they are not sufficiently adverse that they would dissuade a reasonable worker from making or supporting a charge of discrimination. For example, plaintiff fails to show that conducting inspections in the rain—which all employees had to do—was dangerous, as opposed to an annoyance. *See Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 507-08 (S.D.N.Y. 2013) (no adverse employment action where plaintiff "may have been uncomfortable" when supervisor confronted her about her schedule, but she had provided no evidence that the supervisor was dangerous). The other post-complaint conduct that Dhar alleges is similarly trivial. *See Cody v. Cnty. of Nassau*, 577 F. Supp. 2d 623, 645-46 (E.D.N.Y. 2008) *aff'd*, 345 F. App'x 717

(2d Cir. 2009) (finding that several instances of allegedly adverse conduct, including threatening plaintiff with future disciplinary actions and writing plaintiff up for leaving work early, failed to constitute adverse employment actions for purposes of a retaliation claim).

One incident, however, merits further discussion. Following Dhar's initial complaint to DOT's Advocate's Office, Shah apparently asked his supervisor, Mohan, to target Dhar for "harsher" treatment. (Pl. Ex. "TMAO" at 1.) This demand was patently inappropriate, and could have led to an impermissible act of retaliation. Mohan prevented it from coming to pass. Instead of honoring the improper request, he reported Shah's statement to the Advocate's Office, and said that he had disregarded it, and would continue to do so. (*Id.*) There is no evidence that Mohan did subsequently treat Dhar any differently from any other employee, or that Dhar actually experienced an adverse employment action in retaliation for his complaint, even if Shah had hoped to impose one. In the absence of any evidence of an actual adverse employment action, the retaliation claim is dismissed.

## II.    First Amendment Claim

The First Amendment retaliation claim is rooted in Dhar's ejection by Shah from the April 29, 2010 training class for, as Dhar views it, asking questions relating to safety procedures. In order to prove a First Amendment retaliation claim, Dhar must show that (1) his speech was constitutionally protected; (2) he suffered from an adverse employment action; and (3) his speech was a motivating factor in the adverse employment determination. *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir.

2002). As discussed above, Dhar's ejection from the training class, even if it took place exactly as Dhar alleges, was not an adverse employment action. *See supra* at n.4. Moreover, Dhar fails to make the threshold showing that his conduct was protected by the First Amendment.

"[W]hen a public employee speaks as a citizen on a matter of public concern, that speech is entitled to First Amendment protection." *Bernheim v. Litt*, 79 F.3d 318, 324 (2d Cir. 1996) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). However, when a public employee instead speaks as an employee upon matters only of personal interest, such as grievances relating to internal office policy, that speech is not protected. *Connick v. Myers*, 461 U.S. 138, 154 (1983) (the First Amendment does not "constitutionalize the employee grievance."). The first inquiry in this determination is whether the plaintiff spoke as a citizen or as an employee, because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Here, Dhar asked questions in his role as employee, at an official training class, on topics related to his employment and to the subject of the class. There is no question that Dhar made the alleged statements pursuant to his official duties as a bridge inspector. As such, the First Amendment does not protect them, even if the employer discipline in this case had risen to the level of an adverse employment action. Dhar argues that he asked these questions in order to give BIU important

31

feedback for the purpose of improving inspection safety, which is in the public interest. Even if, generally speaking, improved safety measures at bridge inspection sites is in the public interest, Dhar's speech would not be protected because it was "clearly pursuant to [his] official duties." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116-17 (2d Cir. 2011). Moreover, given the nature and setting of the questions, and the fact that Dhar voiced similar grievances on numerous occasions to various supervisors, the context "overwhelmingly suggests that [he] was merely speaking as an employee on matters of internal office affairs" rather than matters of public concern. *Benvenisti v. City of New York*, 04-cv-3166, 2006 WL 2777274, at *12 (S.D.N.Y. Sept. 23, 2006). As such, precedent in this circuit is clear that his questions are unprotected employee speech. *See id.* If Dhar's supervisors saw his questions at the training class as "inflammatory or misguided," as seems to have been the case, "they had the authority to take proper corrective action." *Garcetti*, 547 U.S. at 422. Instructing him to leave the class was just such an exercise of authority. Accordingly, Dhar's First Amendment claim is dismissed.

III. **Equal Pay Act Claim**

Plaintiff asserts a claim under the Equal Pay Act, based on the pay discrepancies between himself and his colleagues. The Equal Pay Act prohibits an employer from discriminating between employees on the basis of sex, by paying an employee less than employees of the opposite sex for equal work. 29 U.S.C. § 206 (d). Because all of Dhar's comparator employees are, like Dhar, male, this claim must fail. As a consequence, Dhar's Equal Pay Act claim is dismissed.

## IV. Section 1985 Claim

Title "42 U.S.C. § 1985 prohibits two or more people from conspiring to interfere with the exercise of another's civil rights based on a discriminatory animus." *Linder v. City of New York*, 263 F. Supp. 2d 585, 591 (E.D.N.Y. 2003). Under the intra-corporate conspiracy doctrine, however, "members of a single entity cannot be found to have conspired together with such entity or with each other in their capacity as members of the entity." *Id.* (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)); *see also Torres v. City of New York*, 13-CV-7091, 2013 WL 6835170 (E.D.N.Y. Dec. 18, 2013). Because all defendants here are either employees of the City of New York or the City itself, Dhar cannot sustain § 1985 claims against them, and, like all of his other claims, these must be dismissed too.

## V. State Law Claims

"Claims of employment discrimination brought under the NYSHRL are analyzed under the same *McDonnell Douglas* framework as Title VII claims." *Batka v. Prime Charter, Ltd.*, 301 F. Supp. 2d 308, 313, n.1 (S.D.N.Y. 2004) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000)). As such, for the same reasons that Dhar's Title VII claims must be dismissed, his NYSHRL discrimination claim is also dismissed.

All federal claims dismissed, the Court declines to exercise supplemental jurisdiction, *see* 28 U.S.C. § 1367(c)(3), over plaintiff's NYCHRL claim, which handles employment discrimination issues differently than Title VII and NYSHRL. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir.

2013) (recognizing that recent legislation by the New York City Council considerably heightened the standard that applies to discrimination claims under the NYCHRL).

VI.    Dhar's Cross-Motion

Since judgment in defendants' favor is appropriate with respect to all federal claims and claims under NYSHRL, plaintiff cannot demonstrate that he is entitled to summary judgment on any of these causes of action. Dhar's cross-motion for summary judgment on his NYCHRL claim is denied without prejudice.

### Conclusion

For the reasons set forth above, summary judgment is granted in favor of all defendants on all outstanding federal and state-law claims, except for plaintiff's claims under the NYCHRL, which are dismissed without prejudice to their re-pleading in a state court of appropriate jurisdiction.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      August 19, 2014

s/Eric N. Vitaliano
_____
ERIC N. VITALIANO
United States District Judge